[No. 18616.  *En Banc.*  February 24, 1925.]

## HILL SYRUP COMPANY, *Appellant,* v. FREDERICK & NELSON, *Respondent.*[1]

CORPORATIONS (160, 162)—ESTOPPEL (35-1)—REPRESENTATION BY OFFICERS — PAYMENT OF PERSONAL DEBTS — NEGLIGENCE — INNOCENT PARTIES. Where a corporation for years permitted its president to maintain a single bank account for the company and himself, which he used for his personal benefit, paying all his personal obligations with company checks, it is estopped to recover company money so paid out; since (1) it must be held to have ratified and confirmed the issuance of such checks, and (2) by its gross negligence it contributed to the fraud or wrong by which innocent parties suffered.

SAME (160, 178)—REPRESENTATION BY OFFICERS—AUTHORITY—NOTICE TO PERSON DEALING WITH CORPORATION. In such a case, it is immaterial that payees of such checks did not know of or rely upon the practice or of the negligence of the company in permitting it, since inquiry, if prosecuted, and inspection of the company's books would have disclosed the long continued practice.

MACKINTOSH, MITCHELL, BRIDGES, and PARKER, JJ., dissenting.

Appeal from a judgment of the superior court for King county, Hon. C. R. Hovey, judge *pro tempore,* entered July 6, 1923, upon findings in favor of the defendant, in an action for money received, tried to the court. Affirmed.

*James R. Chambers,* for appellant.

*Wright, Froude, Allen & Hilen,* for respondent.

*Donworth, Todd & Higgins, Chadwick, McMicken, Ramsey & Rupp, Peters & Powell, Bausman, Oldham & Eggerman,* and *Grinstead, Laube & Laughlin (Hyman Zettler,* of counsel), *amici curiae.*

TOLMAN, C. J.—Appellant was the plaintiff below and appeals from a judgment denying it recovery.

The general history of the Hill Syrup Company is sufficiently set forth in *Hill Syrup Co. v. Marine Na-*

[1]Reported in 233 Pac. 663.

*tional Bank,* 128 Wash. 509, 223 Pac. 595; and *Hill Syrup Co. v. National City Bank of Seattle,* 129 Wash. 171, 224 Pac. 578, in both of which cases rehearings have been granted, and they are therefore now referred to only for the purpose of avoiding a restatement of the general situation.

In this case appellant sued to recover upon a number of checks signed ''Hill Syrup Company, By W. E. Sander, President,'' payable to the respondent and delivered to it by Sander in payment of his personal obligations to it. The trial court, among other things, found:

''That during the year 1916, W. E. Sander and his family acquired the controlling stock of plaintiff, and thereafter held such controlling stock until about September 13, 1921; that during said period plaintiff corporation had no other trustees than W. E. Sander, V. W. Sander and F. T. Kenyon; that said V. W. Sander, the father of W. E. Sander, died during April, 1921; that all of said trustees were during all of said period actively engaged in the business of the company; that said W. E. Sander was president; that said F. T. Kenyon was vice-president and sales manager; that said V. W. Sander was secretary until January 3, 1921, on which date one J. Charles Kerr was elected secretary; that said Kenyon had charge of the sales department, and while he was away from the city at times on business of the company, he was in close touch with the affairs of the company and spent a portion of his time in and about the office of the company while he was in Seattle; that the office of the company was maintained in the same building where it had its factory; that its books were kept in this office under the immediate supervision of W. E. Sander; that the work of keeping said books was performed in most instances by one Miss McConnell, who on January 3, 1921, was elected assistant secretary.

''That, from the time said W. E. Sander first became connected with plaintiff company, he maintained for the company and himself a single bank account in the

name of the company, and paid all his personal bills with checks drawn in the company name, said checks being in some instances payable to his order, and in others payable to the order of his creditors; that in each and every instance when said checks were issued, proper notations thereof were duly entered on the check register, in which the names of the drawer of the check and the payee and the amount thereof were distinctly shown, and all checks so drawn to the order of Sander or for his personal benefit were posted in the company ledger on pages devoted to the personal account of said W. E. Sander, each entry in the ledger having appropriate reference to the check register from which the entry was posted; that said books of account were part of the company's regular books of account; there is no testimony showing authorization by minute entries of these transactions at the time they were had.

"That at various times the personal account of W. E. Sander as shown by said books was overdrawn; that from time to time to meet such overdrafts he paid to the company cash, and conveyed and delivered to the company real and personal property, for which he was given credit in the books of account of the company; that these various items were entered as credits to Sander's personal account in the company ledger, and were also entered in the company's books and are carried and shown as assets of the company; that the ledger entries of such credits referred to the pages in the company journal where the original entries of such transactions were made and therefrom posted in the ledger. Eventually the real and personal assets referred to proved to be of much less value than the amounts for which the said William E. Sander received credit for them on the books of the plaintiff, and specifically one note for $8,800 for which Sander took credit, the company received no corresponding benefit at the time it was given.

"That plaintiff had its books examined by expert accountants at the end of each year; that the examination for the year 1920 was made by E. G. Shorrock & Co., certified public accountants, who submitted to the com-

pany early in January, 1921, their written report of such examination, which report shows large sums carried as assets of the corporation in mortgages and real estate other than the real estate used by the company in its business; that such real estate and mortgages were the identical properties conveyed by Sander to the corporation in reduction of his overdrafts.

"That on January 6, 1920, William E. Sander, then president of plaintiff corporation, executed and delivered to defendant a check for the sum of $300, signed 'Hill Syrup Company, by W. E. Sander, Pres. & Treas.' and made payable to Frederick & Nelson, which check was drawn upon the National Bank of Commerce, which was then the depository of the plaintiff. Thereafter Sander executed and delivered similar checks for the following sums, on the following dates:

| | | |
|---|---|---|
| June | 28, 1920 | $400.00 |
| Oct. | 26, 1920 | 200.00 |
| Dec. | 11, 1920 | 100.00 |
| Jan. | 20, 1921 | 200.00 |
| Feb. | 28, 1921 | 200.00 |
| July | 27, 1921 | 100.00 |

All of these checks bore notations 'Acct. W. E. Sander' or similar statements, and were paid in the regular course of business and applied to the personal account of William E. Sander with the defendant.

"That the custom of Sander in drawing company checks for his own bills was known to the trustees and was followed for such length of time as to charge all the then stockholders with knowledge of this practice, and the new stockholders now controlling said company purchased their stock with knowledge of the fact that Sander had followed this practice.

"That during the time Sander was connected with plaintiff company, the account of said company was carried in the National Bank of Commerce of Seattle, and that during said time all checks issued by said company (including the checks herein mentioned in Finding of Fact VIII) were drawn on said bank and were promptly paid, and were thereafter by said bank returned to plaintiff company and became a part of its records.

"That the books of account of plaintiff company

were at all times open to the inspection of its officers and stockholders and were frequently examined by the members of its board of trustees.

"That from time to time during the period said Kenyon was connected with said company, he caused to be issued company checks, signed by Sander, in payment of his personal obligations; Kenyon never signed any checks; that notations of all checks so issued were made in the books of account of plaintiff company in the same manner as notations were made in said books of company checks issued in payment of the personal obligations of said Sander; that the officers and trustees of plaintiff company, and numerous of its stockholders, knew that company checks were being issued in payment of Kenyon's personal obligations.

"That defendant at no time had any actual knowledge of any lack of authority on the part of said Sander to issue the checks herein mentioned in Finding of Fact VIII."

Upon this finding was based the conclusion of law:

"That the acts of said W. E. Sander in causing to be issued the checks of plaintiff corporation mentioned in plaintiff's complaint and in the foregoing Finding of Fact No. VIII were authorized by plaintiff corporation and have been ratified, confirmed and approved by plaintiff corporation, and plaintiff corporation is estopped from questioning the legality or regularity of its issuance of said checks, and is estopped from asserting any claim against defendant arising out of the issuance of said checks."

We fully admit the general rule laid down in the earlier cases above referred to, which are now pending on rehearing, that a person who receives the checks of a corporation, signed by one of its officers, with knowledge that they are being used by the person who signed them for his individual benefit, is liable to the corporation on an implied contract for money had and received. Such has been our holding in a number of cases. *Mooney v. Mooney Co.,* 71 Wash. 258, 128 Pac.

225; *Hoffman v. Gottstein Investment Co.,* 101 Wash. 428, 172 Pac. 573; *Farmers Market v. Austin,* 118 Wash. 103, 203 Pac. 42; *Barto Co. v. Aylmore,* 125 Wash. 394, 216 Pac. 857; *Schaffer v. Sunnyside-Yakima Oil Co.,* 125 Wash. 689, 215 Pac. 958.

In all of these cases, however, the acts complained of were of a sporadic nature, and nothing in the nature of negligence was shown justifying the application of the exception to the rule, which is as well established as the rule itself.

The findings above quoted, which are supported by the great weight of the evidence, and are therefore binding upon us under our well known and long followed rule, establish that Sander, from the beginning of his connection with the appellant company, maintained the practice of keeping a personal account on its books and using the company's bank account for his personal benefit in connection therewith. He habitually deposited his individual funds with the company, received credit therefor on his individual account, and then checked out, by the company check, the funds he needed for his personal use, from the company's bank account, charging such amounts to his personal account. In the beginning, the transaction was no doubt a wholly legitimate one. The corporation permitted it as a convenience to Sander, and perhaps as a convenience and benefit to itself. There was no thought, probably, of extending credit to Sander, or permitting him to overdraw his account with his company, and of course no thought that he would ever attempt to defraud the company or anyone else by the practice. Such a proceeding was entirely legitimate, and its long continuance was notice to all the world of the authority of Sander to draw the company checks for his individual benefit. That in the course of time Sander became involved and withdrew funds to which

he was not entitled, cannot change the fact that, in the beginning, the practice was an honest and legitimate one, and while not to be encouraged, because of what experience has shown are the possibilities for wrongdoing, still such wrongdoing does not change the fact that the corporation freely permitted the practice over a long period before there was wrongdoing and before knowledge of loss through wrongdoing was brought home to it. The practice by Sander of balancing his personal account by putting in property of little or no value, while it might deceive the corporation as to his wrongdoing, could not deceive it as to the practice itself, for, as we have shown, this was known to it fully, long before any wrongdoing was contemplated. It must be borne in mind that the practice was in no way concealed, but every transaction, as it occurred, was entered upon the books of the company openly, in the ordinary course of business, and these books were at all times available to all interested in the company who were entitled to knowledge of its affairs. Some claim is made that this practice was not actually known to the other trustees or directors and to the stockholders. Our reading of the evidence convinces us that it was, and must have been, fully known to all of the trustees of the corporation, and as to stockholders or creditors, they are not complaining here. This is a suit by the corporation to recover money evidenced by the checks, and the case must be measured by the negligence of the corporation and not by that of its stockholders. We may say in passing, that, since under our statute the trustees of a corporation are elected by the stockholders and are given full power and authority to manage and control the corporation, it would seem that their acts or omissions which bind the corporation must like-

wise bind the stockholders. But that question is not here and we do not decide it.

While we think there is ample in the record to justify the conclusion of the trial court that the acts of Sander were ratified, confirmed and approved by the corporation, and that it is estopped from questioning the legality or regularity of the issuance of the checks in question, yet there is another principle of law which we think controls the disposition of this case, which can be applied even if we assume that the trustees of the corporation had no actual knowledge of, and therefore did not assent to or ratify, the practice of using the company's checks by its president for his personal benefit. That other principle of law, which we feel must be here applied, arises from the fact that the corporation was first at fault in permitting the practice to be initiated, was negligent in permitting the practice to begin and continue, and that its negligence contributed materially to the final results of which it now complains. Notwithstanding the general rule of the liability of the person receiving corporate checks issued by an officer for his individual purpose, it is equally true that the corporation must be wholly free from neglect or fault which contributed to the fraud, before it can recover. It is well settled by a great mass of modern authorities that the corporation cannot recover if it was first at fault and its mistake made possible what in fact transpired. *Scanlon-Gipson Lumber Co. v. Germania Bank*, 90 Minn. 478, 97 N. W. 380; *Fletcher American Nat. Bank v. Crescent Paper Co.*, 139 N. E. (Ind.) 664; *Pannonia Building & Loan Ass'n v. West Side Trust Co.*, 93 N. J. Law. 377, 108 Atl. 240; *First Nat. Bank v. Allen*, 100 Ala. 476, 14 South. 335, 46 Am. St. 80, 27 L. R. A. 426; *Critten v. Chemical Nat. Bank*, 171 N. Y. 219, 63 N. E. 969; *Fifth Nat. Bank of San Antonio v. Iron City Nat. Bank*, 92 Tex. 436, 49 S. W.

368; *General Cigar Co. v. First Nat. Bank of Portland,* 290 Fed. 143; *Hanover Nat. Bank of City of New York v. American Dock & Trust Co.,* 148 N. Y. 612, 43 N. E. 72, 51 Am. St. 721; *Gate City Building & Loan Ass'n v. National Bank of Commerce,* 126 Mo. 82, 28 S. W. 633, 47 Am. St. 633, 27 L. R. A. 401; *Davies & Co. v. Porter,* 248 Fed. 397; *California Vegetable Union v. Crocker Nat. Bank of San Francisco,* 37 Cal. App. 743, 174 Pac. 920; *Otis Elevator Co. v. First Nat. Bank of San Francisco,* 163 Cal. 31, 124 Pac. 704, 41 L. R. A. (N. S.) 529; *Weisberger Co. v. Barberton Savings Bank,* 84 Ohio St. 21, 95 N. E. 379, 34 L. R. A. (N. S.) 1100; *Martin v. Webb,* 110 U. S . 7.

That some of these cases involve forged instruments does not alter the principle announced. It requires no argument to demonstrate that less care should be required to protect one against the crime of forgery than against the abuse of a privilege freely extended, so long as no wrongdoing is involved and legitimate in itself, such as is here involved. Exactly the same in their effect and but giving a different name to the same thing, are those cases which hold that facts which would constitute negligence amount to ratification, the giving of implied authority or estoppel.

"Moreover, the fact that an officer is acting for his personal benefit does not affect persons dealing with him within the apparent scope of his authority, if they are ignorant of such fact. And a corporation may be estopped by having habitually allowed an officer to issue checks, warehouse receipts, etc., to himself, or to issue checks in payment of his individual debts, and thus having clothed him with apparent authority to do so in the particular instance." Fletcher, Cyclopedia Corporations, Vol. 3, § 1929, p. 3125.

This text is supported by the authorities. *Napoleon Hill Cotton Co. v. Oetter Grocery Co.,* 204 Mo. App. 427, 222 S. W. 876; *Napoleon Hill Cotton Co. v. Frank-*

*lin Bank*, 236 S. W. (Mo. App.) 910; *Chicago Auto Sales Co. v. Peters Co.*, 221 Ill. App. 363; *Ehrlich v. Levine*, 83 Misc. Rep. 136, 144 N. Y. Supp. 818; *Watts v. Gordon*, 127 Tenn. 96, 153 S. W. 483; *Corn Exchange Bank of New York v. American Dock & Trust Co.*, 163 N. Y. 332, 57 N. E. 477.

Not only is this the rule generally, but in this court, in the very recent case of *Northern Pacific R. Co. v. Spokane Valley Growers' Union*, 132 Wash. 607, 232 Pac. 691, the principle which we are now attempting to apply was applied in its full force, and under a situation not long continued and dignified by age and custom, but in a case where an employee suddenly went wrong without having previously been under suspicion. In that case a bookkeeper, whose record for honesty and integrity had apparently been perfect, and who had access to the books and records of his employer, took from his employer's safe a number of checks signed in blank, filled them out to his own order and cashed them, and the negligence of the corporation was in leaving the book of signed blank checks in the safe to which the supposedly honest and trustworthy bookkeeper had access. In that case, Mr. Justice Parker, speaking for the court, said:

"Were not appellant's officers guilty of such negligence in signing the blank checks and leaving them in the safe to which Paulson had access as much as they had, in other words, in placing the signed blank checks as much in Paulson's possession as in their own possession, as to now estop appellant from asserting that the checks were then drawn and put in circulation without its authority? We think this inquiry must be answered in the affirmative. The decisions of the courts, it must be conceded, are seemingly not in harmony touching the liability of the signer of blank checks which have found their way into the hands of innocent holders under circumstances more or less similar to those here shown. We think, however, a

considerable portion of such seeming want of harmony has been the result of the varying facts of the particular cases as much or more than the want of harmony in views as to the fundamental principles brought to the aid of the solution of the problem in each particular case. . . . We have read the decisions cited by counsel upon both sides of this controversy thought to have a bearing upon it, and are led to the conclusion, as stated in the text of 3 R. C. L. 1025, that 'sound reason would seem to require the question to be resolved with a view to the facts of the particular case and the principles of negligence.' As to whether or not the negligence of the signer and purported maker of the negotiable instrument is such as to estop the purported maker of the instrument from setting up forgery or want of authority on the part of the one who completes and actually issues the instrument, as in this case, we think ordinarily becomes a mixed question of law and fact; indeed, in its last analysis, almost wholly the latter.''

And the employer is in that case held liable because of its negligence in the one particular instance. How much more here, where the practice was open, long-continued and fully acquiesced in, should the doctrine of negligence be applied and recovery be denied because that negligence made the loss possible? If it be negligence to permit an employee, theretofore trustworthy and of good repute, but without authority to sign checks, to obtain access to signed blank checks on one occasion only, must it not also be negligence to countenance and permit a long indulged practice on the part of an employer with power to sign checks, to so sign and deliver the company's checks for his personal obligation? We think there can in reason be but one answer. Corporations have in modern affairs grown to be common, and they are organized for the carrying on of all kinds of modern business. No divinity hedges them about, and notwithstanding that in certain cases the law will be very tender with the innocent stock-

holder who has suffered a wrong, yet in the ordinary affairs of business where, as here, the corporation itself seeks recovery, the same rule as to negligence must be applied to it as would be applied to any other. Those who, for reasons satisfactory to themselves, procure a corporate charter to carry on commercial affairs, ought not to be permitted to say that they do not know what is being done or suffered by the corporation which they have created and which they manage through their chosen representatives, when those things are wholly unconcealed and fully apparent to anyone who makes even a cursory examination. If we were to close our eyes to the facts clearly established in this case and apply the old rule without the exception, we would in effect thereby say to all trustees, officers and stockholders of corporations: You may entrust your affairs to whom you please, let him deal with them as he will, absolutely without any check or supervision, and if he does wrong the law will right that wrong at the expense of innocent third parties who have relied upon the custom which your negligence has permitted to be established, notwithstanding your gross negligence and careless disregard of your own affairs. Such a course is inherently wrong and inequitable. Rather, we should let the loss fall upon that one of two innocent parties whose negligence has made the loss possible.

But it is contended that respondent did not know of, and therefore did not rely upon, the practice heretofore outlined, and that advantage cannot be taken of such practice and of the negligence of the corporation in permitting it, since it was so unknown and not relied upon. Under the authorities, this contention cannot be sustained. Admitting that the checks were under a cloud and that the payee was under obligation to make inquiry to dispel that cloud, the facts which would have been disclosed on a reasonable inquiry would have re-

moved the cloud, since inquiry at the company's office and examination of its books would have shown the long-continued practice. It is therefore quite immaterial whether the payee actually made the inquiry or not. The general rule seems to be that, though inquiry may have been omitted, the payee, none the less, may claim the benefit of anything that inquiry would have developed. *Buckley v. Lincoln Trust Co.*, 72 Misc. Rep. 218, 131 N. Y. Supp. 105; *Mutual Trust Co. v. Merchants' Nat. Bank of City of New York*, 236 N. Y. 478, 141 N. E. 922. But, in any event, if the complaining company had exercised due diligence, these checks would never have been issued, as the slightest care in protecting its own interest would have brought about a discontinuance of the practice long before these checks were made or negotiated.

We have carefully read and considered the great mass of authorities called to our attention by the appellant. The industry of counsel has been unusual and is to be commended, and he has brought to our attention such a mass of cases that it is wholly impractical to consider and analyze them in this opinion. Our study of them, however, convinces us that none of his cases contradicts the doctrine that the gross negligence of the corporation precludes recovery, and, under the facts here, the corporate negligence was so gross as to leave no doubt in the minds of a majority of this court that the rule which we have attempted to define should be applied. We are therefore constrained to affirm the judgment of the trial court.

Judgment affirmed.

HOLCOMB, MAIN, and ASKREN, JJ., concur.

FULLERTON, J. (concurring)—I concur in the result reached by Chief Justice Tolman in the foregoing opinion, although I cannot concur entirely in his rea-

soning or the grounds upon which the conclusion is rested. Want of time prevents me from setting out my views at length, but I may say briefly that, in my opinion, the modern relation of corporations to the business world requires a departure from the old rules governing the liabilities of persons dealing with them. The legislature of this state has made the organization of a corporation a simple matter. It has provided that they may be organized for the transaction of practically every sort of business. While it has provided that the corporate powers of the corporation shall be vested in a board of trustees, it has further provided that this board may appoint such officers, agents and servants as the business of the corporation may require, and vest in these officers, or any one of them, the entire management of its business affairs. One of the results has been and is that corporations are managed much as a like business of a private individual or of a partnership is managed. A further result is that almost every business enterprise in the state is conducted through the instrumentality of a corporation. Privately conducted business enterprises, or business enterprises conducted by means of a partnership, are now the exception rather than the rule. There is a reason for this apart from the ease with which corporations may be formed, and apart from the simplicity with which their businesses may be managed. It arises from our community property laws. These laws, as every lawyer knows, add a hazard to a privately conducted business which did not obtain under the common law rules relating to the ownership of property. A corporation relieves the business from this hazard.

It is my opinion, therefore, that when a corporation trusts the conduct of its business to a manager, it alone should be responsible for the acts of that manager. If he violates his trust, the losses caused thereby should

be visited upon the corporation, not upon those who deal with the corporation in the usual course of business and with the person who is held out to represent the corporation, even if so to do violates some of the ancient rules laid down for their management. To hold otherwise, under the present conditions, is to make the innocent rather than the guilty the guarantor of the faithfulness of the corporation's officers. As I view the present transaction, it shows no liability on the part of those whom it is sought to charge. I conclude that the judgment is rightfully affirmed.

MACKINTOSH, J. (dissenting)—I adhere to the views expressed in 128 Wash. 509, 223 Pac. 595 and 129 Wash. 171, 224 Pac. 578, and therefore dissent from this opinion.

MITCHELL, BRIDGES, and PARKER, JJ., concur with MACKINTOSH, J.